UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
KRISTEN BURKE,

                    Plaintiff,


        -against-

                                                  07 CV 3732 (GBD)


DANIEL RODRIGUEZ,

                    Defendant.
-------------------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW


                                        **ROBINSON & YABLON, P.C.**
                                        Attorneys for Plaintiff
                                        232 Madison Avenue, Suite 1200
                                        New York, New York 10016
                                        (212) 725-8566


Of Counsel:

Andrew M. Laskin, Esq.

Dated August 16, 2007

## **Introduction**

Plaintiff, Kristen Burke, by counsel, submits the following Memorandum of Law in support of her cross-motion to amend the complaint and in opposition to defendant's motion to dismiss.

This is a diversity action for injuries sustained by plaintiff due to the wrongful conduct of the defendant. During the course of plaintiff's employment with non-party Morgan Stanley ("Morgan"), defendant willfully, fraudulently and wrongfully lured plaintiff into a romantic relationship. The means by which defendant accomplished his fraud was the use of Morgan's telephones, voicemail system, emails, instant messages and personal interactions with plaintiff at her Morgan work station. By way of an elaborate scheme to defraud, and by use of Morgan as a backdrop to and instrument in that scheme, defendant fraudulently deceived plaintiff resulting in her termination for cause from her position at Morgan. As a result of defendant's willful, wanton and reckless conduct, plaintiff seeks both compensatory and punitive damages.

Plaintiff, mindful of the pleading requirements of Rule 9 of the Federal Rules of Civil Procedure, hereby offers her Second Amended Verified Complaint, delineating further the extent of the defendant's misconduct. Plaintiff notes that the vast bulk of the dates, times and further particulars of plaintiff's claims are contained in the emails, phone system records, computers, and personal knowledge of employees of non-party Morgan. For that reason and that reason alone, a non-party subpoena was previously served on Morgan. The Court quashed the subpoena, but plaintiff respectfully requests, in light of the attestations set forth in her proposed Second

Amended Verified Complaint annexed hereto, that she be permitted to reissue the subpoena now that the Rule 26 meeting between counsel has occurred. While we submit that the proposed pleading complies with Rule 9, should the Court be inclined to require plaintiff plead her claims with further particularity, plaintiff should be allowed to conduct limited subpoena-based discovery from Morgan including requests for emails and computer data and non-party depositions of select Morgan employees.

## Pleading of Fraud With Particularity

As stated by United States District Judge Hall *in IM Partners v. Debit Direct Ltd.*, 394 F.Supp.2d 503, 514 (D.C. Ct. 2005):

> The defendants challenge the sufficiency of the plaintiffs' pleading under Rule 12(b)(6) and Rule 9(b). A motion to dismiss filed pursuant to Rule 12(b)(6) can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Reed v. Town of Branford*, 949 F.Supp. 87, 89 (D.Conn.1996). In considering such a motion, the court accepts the factual allegations alleged in the complaint as true and draws all inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). "In considering a motion to dismiss ... a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference ... [and review all allegations] in the light most favorable to the non-moving party." *Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir.1996). Rule 8 of the Federal Rules of Civil Procedure provides that a complaint "shall contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).
>
> [10] Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). "[T]he complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)). In addition, the complaint should explain how the misrepresentations were fraudulent and "plead those events which give rise to a strong inference that the defendant[ ] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." ***Caputo v. Pfizer, Inc.***, 267 F.3d 181, 191 (2d Cir.2001) (citing *Connecticut Nat'l. Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987)).

"Dismissal pursuant to Fed. R. Civ. P. (12)(b)(6) 'is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief.'" *Jin v. EBI, INC.*, 2006 WL 3335102 (EDNY 2006 [Garaufis,J]), *in turn citing, Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). "Where, as here, plaintiff[] specifically request[s] leave to amend in the event the Court is inclined to dismiss on Rule 9(b) grounds, the failure to grant leave to amend is an abuse of discretion unless the plaintiff has acted in bad faith or the amendment would be futile." *Caputo v. Pfizer*, 276 F.3d 181, 191 (2d Cir. 2001).

Here, plaintiff has re-plead her complaint with greater specificity so as to comply with Rule 9(b). By way of the specific claims contained therein, plaintiff now has satisfied her duty to plead: (1) the detail of the fraudulent statements; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent. *Wurstbaugh v. Banc Am. Secs.,* LLC, 2006 WL 1683416, *6 (S.D.N.Y. 2006 [Cote, J]). Moreover, upon plaintiff being furnished the opportunity to conduct non-party discovery from plaintiff's and defendant's former employer, Morgan, plaintiff will be able to furnish defendant with even more specific dates and times of his material misrepresentations. At this stage of the proceedings, however, plaintiff has fulfilled her obligation with respect to the specificity of her pleadings.

### Tortious Interference With Contract

Defendant argues that the State of New York does not recognize a cause of action by an at-will employee for tortious interference with employment relations. Case law, however, establishes that this is a frivolous, or at least unstudied, argument. New York courts recognize a cause of action for tortious interference by a plaintiff against her coworkers. *See, e.g. Mansour*

*v. Abrams*, 120 A.D.2d 933 (4th Dep't 1986) (holding "[i]mproper interference with a contract

terminable at will is actionable); *Bonanni v. Straight Arrow Publishers, Inc.*, et al, 133 A.D.2d

585 (1st Dep't 1987) (a coworker may be held liable for tortious interference if the complaint

states the coworker utilized fraud, misrepresentation, deceit or other tortious means, or that he

acted purely with malice); *Miller v. Richmond*, 184 A.D.2d 191 (4th Dep't 1992); and *Critton v.*

*State of New York*, 12 A.D.2d 216 (1st Dep't 2004).   In fact, three short weeks before defense

counsel authored his Memorandum of Law,  a case was published on the front page of the New

York Law Journal which states the inverse of what defendant now alleges.


In *Barcellos v. Robbins*, 15 Misc.3d 1130(A) (Supreme Court, Richmond County, May 4,

2007 [McMahon, J.]) the Court denied the defendant's motion pursuant to CPLR §3211(a)(7),

the state court equivalent of FRCP Rule 12(b)(6).  As Judge McMahon stated:

> Addressing the cross-motion first, the defendants argue that the complaint
> must be dismissed as New York does not recognize a cause of action for
> tortious interference with employment. In _Ingle v. Glamore Motor Sales (73_
> _NY2d 183 [1989])_, the Court of Appeals held that because there is no cause
> of action in tort for wrongful discharge of an at will employee, a plaintiff could
> not circumvent this rule and sue his employer by recasting his cause of action
> in the garb of a tortious interference with employment _(73 NY2d 183, 189)._
> Contrary to the defendant's contentions, however, *Ingle* did not address the
> situation of a plaintiff asserting a cause of action for tortious interference with
> employment against co-employees.
>
> As set forth in this court's prior order, in order to adequately set forth a claim
> for tortious interference with employment against co-employees with regard to
> allegations concerning an at-will employment, the plaintiff has the high burden
> of asserting that the defendants used wrongful **2 means, such as fraud,
> misrepresentation or threats to effect the termination of employment (*see,*
> _Lockheed Martin Corp. v. Aatlas Commerce Inc., 283 AD2d 801, 803_ [3d
> Dept. 2001]). This rule was set forth by the Third Department in _Murray v._
> _SYSCO_ (273 AD2d 760 [3d Dept. 2000]), subsequent to the Court of Appeals
> decision in *Ingle*. The Third Department did not cite to *Ingle*, but rather cited to
> _Guard-Life Corp. v. Parker Hardware Mfg. Corp. (50 NY2d 183, 194 [1980])_, a
> case involving a terminable at will contract for merchandise.
>
> The tortious interference with employment rule set forth by the Third
> Department has not be utilized by the Second Department. However, although
> not specifically recognizing the validity of such cause of action, the Second
> Department in _Negron v. JP Morgan Chase (14 AD3d 673_ [2d Dept. 2005])

held that a complaint asserting a cause of action of tortious interference against individual defendants should be dismissed as it consisted only of bare legal conclusions and factual allegations contradicted by the record. Since the Second Department did not state that there was no such cause of action, the plaintiff's argument that the Second Department does recognize the validity of such cause of action has merit.

This court agrees with the defendants that their position has support in cases from the First Department. In _Lobel v. Maimonides Medical Center, (___ AD3d ___, 2007 WL 1052823_ [1st Dept. Aptil 10, 2007]), _Thomas v. Guardian Life Ins. Co._ (12 AD3d 285 [1st Dept. 2004]) and _Thawley v. Turtell_ (289 AD2d 169 [1st Dept.]), the court held that as an at-will employee, plaintiff can have no cause of action based on a co-employee's alleged tortious interference with her employment. The First Department cited to _Guard-Life Corp. v. Parker Hardware Mfg. Corp._ (50 NY2d 183, supra), in support of this holding.

**However, in other cases the First Department has recognized a claim for tortious interference with employment for an at-will employee. In _Hoesten v. Best_ (34 AD3d 143 [1st Dept. 2006]), the First Department, also citing _Guard-Life Corp. v. Parker Hardware Mfg. Corp._ (50 NY2d 183, supra), held that "[a]s an at-will employee with no written contract, plaintiff could only succeed on his tortious interference [with employment] claim if he established that [the co-employee defendant] acted solely to harm him or used wrongful means to achieve the interference". Additionally, in _Marino v. Vunk_ (___ AD3d ___, 2007 WL 1120457_ [1st Dept. April 17, 2007]), the First Department held that "where . . . the individual defendants are co-employees of plaintiff, in order for a claim of tortious interference with an employment relationship to lie, it must be alleged that defendant co-employees acted outside the scope of their authority". Thus, it appears that there is a split in the First Department on this issue.**

Although this court finds that both parties' have presented case law to support their positions and that further clarification from the Court of Appeals would be of great assistance, the defendants' motion must be denied. On a motion to dismiss for failure to state a cause of action pursuant to CPLR 3211(a)(7), the court must give the plaintiff the benefit of every possible inference in determining whether the facts as alleged fit within any cognizable legal theory (_Sokoloff v. Harriman Estates Dev. Corp._ (96 NY2d 409, 414 [2001]; _Leon v. Martinez_, 84 NY2d 83, 87-88 [1994]). As there is no holding from the Second Department that an at-will employee cannot allege a cause of action for tortious interference with employment against her co-employees, and there are cases from both the First and Third Departments recognizing the validity of such cause of action, this court finds that the defendants have not sustained their burden in proving that the complaint fails to state a cause of action. The court notes that the **3 defendants have not alleged that the wrongful conduct on the part of the individual defendants set forth in the complaint does not support a cause of action for tortious interference with employment (compare, _Lockhead Martin Corp. v. Aatlas Commerce Inc._, 283 AD2d 801, supra).

(emphasis added)

The result in *Barcellos* is warranted here because plaintiff alleges sufficient conduct on the part of defendant to establish the requisite elements of plaintiff's cause of action. Plaintiff cannot be deprived of her day in Court without having the opportunity to conduct discovery and present her case before a jury.   Defendant's papers address neither the *Barcellos* ruling nor an ample body of federal District Court decisions on this issue.  While defendant would have this Court ignore federal cases, those cases are entirely learned.

In *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996), the Second Circuit reasoned:

### 2. *Rights of At Will Employees.*

[13] [14] [15] We further agree with the district court that an employee serving purely *1295 at will, by definition, has no contractual right to avoid dismissal. However, New York law recognizes that the at will relationship entails certain limited rights, *see Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 851-52 (2d Cir.1985) (discussing contractual principles underlying New York's at will doctrine), including the right to maintain an action for tortious interference in certain limited situations. *Mansour v. Abrams,* 120 A.D.2d 933, 934, 502 N.Y.S.2d 877, 878 (4th Dep't 1986); *see also Agugliaro v. Brooks Bros., Inc.,* 802 F.Supp. 956, 963 (S.D.N.Y.1992) (at will employee who was terminated for an illegal reason may maintain action); Restatement (Second) of Torts, § 766, cmt. g (1979) (at will employee may maintain an action for tortious interference). Therefore, the district court erred in holding that Dr. Finley cannot maintain an action for tortious interference by virtue of her at will status.

Similarly, in *Hoffman v. DC37*, 2002 WL 31045858 (SDNY 2002 [Francis, MJ]), the Court ruled:

### D. *Tortious Interference With Business Relationships*

A plaintiff who does not have an employment contract may not " 'evade the employment at-will rule and relationship by recasting [a] cause of action in the garb of tortious interference with ... employment." ' *Albert,* 239 F.3d at 274 (quoting *Ingle,* 73 N.Y.2d at 189, 538 N.Y.S.2d at 774); *see also Miller v. Richman,* 184 A.D.2d 191, 192, 592 N.Y.S.2d 201, 202 (4th Dep't 1992) ("Plaintiff cannot circumvent the employment at-will rule by asserting causes of action for defamation, injurious falsehood and tortious interference with her employment.").

An at-will employee may maintain a tortious interference claim, however, in "certain limited situations." *Finley,* 79 F.3d at 1295; *see also Mansour v. Abrams,* 120 A.D.2d 933, 934, 502 N.Y.S .2d 877, 878 (4th Dep't 1986). To do so, he or she must establish that a "third party used wrongful means to effect the termination such as fraud, misrepresentation, or threats, that the means used violated a duty owned by the defendant to the plaintiff, or that the defendant acted

with malice." *Cohen v. Davis, 926 F.Supp. 399, 403 (S.D.N.Y.1996)* (citing New York cases).*4 *Albert, 239 F.3d at 274*.

In this context, "malice" refers to "act[ing] with the sole purpose of harming plaintiffs." *Schoettle v. Taylor, 282 A.D.2d 411, 412, 723 N.Y.S.2d 665, 666 (1st Dep't 2001)*; *accord Scalise v. Adler, 267 A.D.2d 295, 296, 700 N.Y.S.2d 49, 51 (2d Dep't 1999)*. Here, the complaint implies that the Perot Defendants interfered with the plaintiffs' employment relationship not out of mere malice, but to achieve more project responsibility and profit for themselves. This would negate malice as a basis of liability for tortious interference. *See Besicorp Ltd. v. Kahn, 147290 A.D.2d 708, ___, 736 N.Y.S.2d 708, 711-12 (3d Dep't 2002)* (desire to maximize financial gain precludes finding of malice as sole motivation).

But even if the complaint does not adequately allege malice, it does assert that the Perot Defendants utilized improper means to encourage DC37 and BFT to terminate the plaintiffs. Specifically, the plaintiffs assert that these defendants defamed them by presenting false criticisms of their performance and that this resulted in their being fired. Such allegations are sufficient to support a claim of intentional interference with business relationships. *See Cohen, 926 F.Supp. at 403-04* (false and misleading reports about plaintiff); *Coliniatis v. Dimas, 848 F.Supp. 462, 470 (S.D.N.Y.1994)* (allegedly defamatory letter would constitute wrongful means); *Freedman v. Pearlman, 271 A.D.2d 301, 305, 706 N.Y.S.2d 405, 409 (1st Dep't 2000)* (intentionally false communication with prospective employer). Therefore, the Ninth and Tenth Causes of Action should not be dismissed.

Based upon this precedent, it becomes clear that defendant's motion should not have been brought. The sole motivation of defendant is to exhaust a lone, wrongfully discharged employee, without deep pockets and to dissuade plaintiff from seeking the legal relief to which she is entitled. "Job loss is a discrete life event with multiple health and mental health impacts including depression, health complaints and impaired psycho-social functioning." Price, Job Loss: *Financial Strain and Loss of Control Lead to Depression,* Journal of Occupational Health Psychology (2002). Kristen Burke has taken the courageous step forward of seeking to hold defendant responsible for his acts and omissions, and she should not be denied the opportunity to prove her claims.

Defendant's reaction to the issuance of the non-party subpoena on Morgan speaks volumes about Mr. Rodriguez' well-founded concern over what the documents from his employer will show. The

time has now come for Mr. Rodriguez to respond to the complaint, submit to discovery, and answer for his actions.

## Conclusion

For all the foregoing reason's plaintiff's cross-motion to amend should be granted and the defendant's motion denied in its entirety.

ROBINSON & YABLON, P.C.
Attorneys for Plaintiff

By: _____
Andrew M. Laskin (AL9379)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
KRISTEN BURKE,

                        Plaintiff,

                 -against-

DANIEL RODRIGUEZ,

                      Defendant.

------------------------------------------------------------------------X

**PLAINTIFF'S**
**SECOND AMENDED**
**VERIFIED COMPLAINT**

07 Civ 3732 (GBD)

*Plaintiff Demands*
*A Trial by Jury*

    **Plaintiff, KRISTEN BURKE,** by her attorneys, **ROBINSON & YABLON, P.C.,** complaining of the Defendant, DANIEL RODRIGUEZ, alleges as follows:

## BASIS OF JURISDICTION

    1.     This is an action pursuant to New York State law.  The jurisdiction of this Court is predicated upon diversity of citizenship pursuant to 28 U.S.C. §1332 because the dispute involves parties from different states and damages in excess of one hundred thousand dollars ($100,000.00).

## IDENTITY OF PARTIES

    2.     At all times hereinafter mentioned, Plaintiff, KRISTEN BURKE, was a citizen of the State of New Jersey.

—EXHIBIT 1—

3.     At all times hereinafter mentioned, Defendant, DANIEL RODRIGUEZ was a citizen of the State of New York.

## FACTUAL CONTENTIONS

4.     On or about May 9, 2006, Plaintiff, KRISTEN BURKE, was hired by Morgan Stanley ("Morgan") for the position of Associate in the Institutional Technology Group. Plaintiff's base salary was $85,000.00 per annum exclusive of bonuses and other benefits.

5.     As of May 9, 2006, and for several years prior, Defendant, DANIEL RODRIGUEZ, was an Executive Director at Morgan.  In said capacity, Defendant, DANIEL RODRIGUEZ was the head of Morgan's Risk Modeling Group.

6.     On or about May 30, 2006, Plaintiff, KRISTEN BURKE, began work at Morgan at the employer's office located at 750 7th Avenue.  She was assigned to a work space on the building's 32nd floor.

7.     Among Plaintiff, KRISTEN BURKE's duties and responsibilities were the oversight and training of approximately twenty-eight Technology Group trainees.  After completion of the training program for said trainees, Plaintiff was responsible for placing them in full time positions at Morgan's offices worldwide.

8.     Part of the Plaintiff, KRISTEN BURKE's job responsibility was interaction with Morgan hiring managers at the Executive Director level and above for placement of trainees in full time roles throughout Morgan's offices worldwide.  Managers would frequently call and email Plaintiff requesting trainees and trying to find out whether or not their group would be receiving a trainee.  Plaintiff's role involved heavy interaction with executive level managers at Morgan.

9.     Each manager who made such inquiries was concerned about securing trainees for their department who were the best of the class, and each director directly or indirectly made such concern clear to Plaintiff.  There was a great deal of competition in obtaining a trainee.

10.     In or about January 2007, Defendant, DANIEL RODRIGUEZ, an Executive Director at Morgan, whose office was on Morgan's 33rd floor, introduced himself to Plaintiff inside a Morgan elevator. He first introduced himself as the Head of the Risk Management Team. He asked Plaintiff her name, asked how to spell her name, how long she has been working at Morgan, and what was her role at Morgan.  When Plaintiff returned to her desk moments later there was an email from Defendant asking Plaintiff to join him for coffee in the future to discuss technology at Morgan.  Defendant stressed that he had a strong interest in technology and was eager to learn more.

11.     Thereafter, Defendant, DANIEL RODRIGUEZ did call, instant message and email Plaintiff, numerous times a day, with respect to Defendant's alleged interest in learning more about technology at Morgan and the Graduate Training Program.

3

12.     Given Defendant's superior position as a Morgan Director, Plaintiff did respond to Defendant's repeated inquiries as she believed, at the time, said inquires were genuine.

13.     In point of fact, Defendant was utilizing his position of superiority at Morgan to manipulate Plaintiff so that she would respond to his inquiries which were not genuine, but rather veiled attempts to engage Plaintiff in personal conversation to fulfill Defendant's romantic interest in Plaintiff.

14.     Defendant, in his professional capacity at Morgan, fraudulently called, emailed, instant messaged and otherwise pursued Plaintiff knowing full well his technology-labeled inquiries were veiled attempts to enter into a social and romantic relationship with Plaintiff. Defendant, by virtue of his special relationship with Plaintiff given their respective employment positions, had a duty to provide Plaintiff with correct information.

15.     In furtherance of his fraudulent scheme, Defendant, DANIEL RODRIGUEZ did then begin to pursue Plaintiff, many times per day and entirely in the course of their respective employment at Morgan, by email, phone calls, instant messaging and personal visits to her Morgan work station.

16.     Defendant would stop by Plaintiff's work station numerous times a day.  All interactions occurred on 32nd floor in front of Plaintiff's coworkers.

17.    After a few days of such emails, phone calls, instant messages, and visits to her work station, Defendant asked Plaintiff if she would discuss the Technology Group trainee issue with him over coffee at a local Starbucks next door to Morgan on 7th Ave.  Plaintiff agreed.

18.    When Plaintiff accompanied Defendant for coffee, Defendant, in furtherance of his fraudulent scheme, asked Plaintiff far fewer questions about the Technology Group trainees and more questions about Plaintiff's work schedule and personal life.

19.    Defendant learned that Plaintiff often worked late at Morgan, so he began calling and visiting her work station later at night when fewer Morgan employees were present.

20.    During one of Defendant's discussions with Plaintiff at Morgan, he told Plaintiff he was single, had never been married, and lived in a studio apartment alone in Manhattan on West 59th Street.  Said statements were false yet Plaintiff, to her detriment, relied upon them as true. The statements were false because Defendant was married, lived in Fishkill with his wife and family and maintained no residence in Manhattan.

21.    Defendant told Plaintiff his work at Morgan and his prior employment positions had left him little time to pursue personal relationships, but he wanted very much to find the right person with whom he could settle down and start a family.  He said that a relationship with a woman was the one thing missing in his life. Said statements were false yet Plaintiff, to her detriment, relied upon them as true. The statements were false because he already had a wife and had already started a family.

22.     All of Defendant's false statements were uttered by Defendant for the purpose of misleading Plaintiff.

23.     Plaintiff was misled by Defendant by virtue of his position of superiority at Morgan and his weaving of Morgan related issues into his personal discussions when he spoke to Plaintiff. By utilizing discussions about Plaintiff's role at Morgan and Defendant's status as a Director at Morgan into his web of deceit, Defendant took advantage of Plaintiff's vulnerability.

24.     Plaintiff shall be able to particularize with further specificity the dates and times of the Defendant's fraudulent acts and omissions upon retrieval of her voicemails, her emails and Defendant's emails from non-party Morgan.

25.     After approximately four weeks of frequent coffee outings from Morgan, Defendant asked Plaintiff to lunch.  Plaintiff agreed.  He then began asking her to lunch and coffee breaks daily.  On a daily basis the Defendant and Plaintiff would take coffee breaks, lunch breaks, and leave work together.

26.     Defendant told Plaintiff he lived in a studio apartment on West 59th Street.  When they would leave work together at the end of the day he would walk in the direction of where he claimed his apartment was located.

27.     The statements uttered by Defendant regarding his living arrangements were false and were calculated to mislead Plaintiff into believing Defendant was single.  He told Plaintiff

his apartment was under construction and that was the reason she could not visit him.

Defendant's statements were false because he did not own or rent a Manhattan apartment and, as such, his home was not under construction.

28.    Defendant, after fraudulently misleading Plaintiff to obtain her trust, learned Plaintiff had just ended a lengthy engagement after learning her fiancée had been unfaithful to her.  When Defendant learned of Plaintiff's resultant emotional frailty, he exploited it to his advantage by further advancing his fraudulent scheme.

29.    After several lunch outings, all of which were during Morgan business hours, Defendant asked Plaintiff to dinner.

30.    Plaintiff, worried that a relationship or even the appearance of a relationship could adversely affect her career at Morgan, declined.

31.    Defendant would not take no for an answer, and continuously reiterated his dinner invitation until Plaintiff reluctantly agreed to have dinner with him.

32.    Defendant's relentless and harassing pursuit of Plaintiff violated Morgan's internal code of conduct.

33.    On Friday, February 24, 2007, the day Plaintiff finally joined Defendant for dinner, Defendant had luggage with him.  He claimed he was staying at a Holiday Inn Express

on 28th street in Manhattan since his studio apartment was under construction. When Plaintiff asked Defendant why he needed to stay in a hotel if he lived in Manhattan, Defendant fabricated a story about construction work being performed in his apartment making it unlivable.

34.    That same evening. when Plaintiff went to dinner with Defendant, he told her he intended to leave Morgan and that he was interviewing with Credit Suisse for a job at their institution.  He said that he needed Plaintiff's opinion on the matter of his leaving Morgan, and that he really appreciated her listening to his concerns.

35.    Defendant told Plaintiff the departure from Morgan would be a difficult one because Defendant's boss, Morgan's Tom Duala, was a personal friend, and Defendant's former professor.  Defendant alleged he and Duala had a close bond since they both served in the military.

36.    Defendant told Plaintiff that Tom Duala looked at Defendant as his son, and that Duala was personally responsible for helping Defendant secure his position at Morgan.

37.    Defendant told Plaintiff that many of Tom Duala's Morgan subordinates were jealous of Defendant and his relationship with Tom Duala.

38.    Defendant claimed that, as a result of his relationship with Tom Duala, Defendant secured a higher end of year bonus than he would have otherwise been entitled to but for Tom Duala's "pulling strings" for him.  Defendant stated that his bonus was on the same level as

Morgan colleagues with greater seniority. Defendant's statements in this regard were false and were further in violation of Morgan's internal code of conduct.

39.    Defendant told Plaintiff that Tom Duala's 2006 year-end bonus from Morgan was $10 million. Defendant's statement was false because Defendant had no personal knowledge of Tom Duala's salary or bonus.

40.    Defendant told Plaintiff that, as a result of his exemplary reputation, recruiters would call him on a regular basis trying to lure him away from Morgan. Defendant claimed he would always tell recruiters he was not interested because of his loyalty to Morgan's Tom Duala.

41.    However, one such recruiter, according to Defendant, secured Defendant's interest in a position at Credit Suisse.

42.    Defendant claimed the prospective position at Credit Suisse was so lucrative, that the recruiter would personally receive nearly a $300,000.00 bonus just for bringing Credit Suisse Defendant as the right candidate for the job. Said statement was false because there was no such recruiter and no recruiter would receive such a bonus.

43.    Defendant told Plaintiff that, notwithstanding his loyalty to Tom Duala, Morgan was "cheap" when it came to its dealings with Defendant.

44.     For example, Defendant told Plaintiff that when he traveled to London in early 2007 for company business, Morgan made Defendant share a room with a co-worker because Morgan did not want to pay for separate rooms.

45.     Defendant told Plaintiff that Morgan's frugality adversely affected Defendant's dating of women when he was on Morgan business trips because he could not bring said women back to his hotel room where a co-worker was staying. These statements were false because Defendant did not date other women on Morgan business trips.

46.     Defendant's statements to Plaintiff regarding his relationship with Morgan and his reasons for wanting to leave were patently false and were uttered by Defendant as veiled lead-ins to his discussions about hotel room's and alleged sexual liaisons with other women on business trips. Plaintiff relied upon Defendant's false statements to her detriment.

47.     After they ate dinner that first night, Defendant and Plaintiff saw a movie. At the theater, they ran into Morgan's Jane Hong. Ms. Hong would later confront Plaintiff at Morgan regarding her outing with the Defendant.

48.     Jane Hong was a Vice President at Morgan and the Defendant's direct manager.

49.     This situation proved very awkward for Plaintiff. Jane Hong told numerous employees at Morgan that she saw Plaintiff and Defendant holding hands while at the movie.

50.     During the evening of their first dinner, Defendant told Plaintiff that work at Morgan prevented him from having a family and he wanted to remove that obstacle from his life. Defendant's statements in this regard were false, because Defendant was married and had a son, yet Plaintiff relied upon them to her detriment.

51.     Defendant told Plaintiff he was finally ready to make such a commitment. Inasmuch as Defendant was married and had a child, his statements to Plaintiff were false. Moreover, Defendant's statements were in violation of Morgan's internal code of conduct.

52.     Plaintiff relied upon Defendant's statements, not knowing at the time that they were false.

53.     After the dinner/movie outing, Plaintiff left Defendant and took the NJ Transit bus back to her home in Fort Lee, NJ.

54.     The following morning, on Febraury 25, 2007, Defendant called Plaintiff and asked her to go to dinner with him that night in Manahttan.

55.     On Monday, Febraury 27, 2007, Defendant again took Plaintiff to dinner, this time to a nearby restaurant named  MARS 2112.  At dinner, Defendant claimed he was getting ready for a business trip to Chicago.

56.     After dinner, Plaintiff invited Defendant back to her apartment in New Jersey.

57.     Plaintiff and Defendant went back to Plaintiff's apartment at which time they engaged in sexual intercourse. Defendant spent the night with Plaintiff.

58.     The following morning, on February 28, 2007, Plaintiff dropped Defendant off at work.

59.     Defendant stayed at Plaintiff's apartment on three additional occasions in March and April 2007. Plaintiff also went out one evening in Manhattan with Defendant's co-workers from Morgan, in addition to her friends. Defendant left clothing at Plaintiff's apartment and other personal effects.

60.     Defendant's co-workers from Morgan knew that Defendant and Plaintiff were dating. These co-workers reported directly to the Defendant.

61.     Defendant also continued the deluge of phone calls, emails, instant messages and visits to her Morgan work station. This occurred numerous times a day on a daily basis.

62.     In early April 2007, Defendant told Plaintiff he would need to travel to Houston, Texas later that month for the Sino-US Energy Market Development & Risk Management Seminar.

63.    Defendant asked Plaintiff to accompany him to Houston for the seminar which was scheduled for the weekend of April 27, 2007.

64.    Plaintiff agreed to accompany Defendant to Houston, and asked Defendant how he planned to travel.

65.    Defendant told Plaintiff he was traveling on Jet Blue Flight #629 out of JFK on April 27, 2007, and Defendant told Plaintiff to book herself onto his flight and request a seat next to him. Defendant further instructed Plaintiff to book herself onto his return flight, #626, returning to JFK on April 29, 2007. Defendant provided Plaintiff with such information by way of an email from his Morgan work station to Plaintiff's Morgan email address.

66.    On April 6, 2007, Plaintiff went onto Jet Blue's website and booked herself on the Defendant's flights.

67.    Plaintiff then called Jet Blue to request a seat next to Defendant on both flights.

68.    During the telephone call, Plaintiff provided the Jet Blue reservation person the flight number and Defendant's name and the dates of travel.

69.    Before Plaintiff gave her own name, however, the Jet Blue reservation person asked Plaintiff if she was "Robin Rodriguez" and whether she lived at "Maurerbrook Drive in Fishkill, New York." Plaintiff said she was not "Robin Rodriguez."

70.     Plaintiff then emailed and called Defendant at Morgan to ask him about Robin Rodriguez.

71.     Defendant lied, stating he had no idea who Robin Rodriguez was, even though Robin Rodriguez was his wife who lived together with him in Fishkill, New York.

72.     Defendant continued the lie, stating to Plaintiff, that the name Rodriguez was very popular and that mistakes like this happen all the time. He used as an example the claim that three different persons named Dan Rodriguez's work at Morgan Stanley. Defendant's statements were false because he knew the Jet Blue reservation person was referring to records of prior travel by Defendant with his wife, not to another "Dan Rodriguez."

73.     Defendant told Plaintiff there were plenty of people named "Dan Rodriguez," and that the Jet Blue person had obviously made some sort of a mistake. Defendant's statements in this regard were patently false.

74.     Plaintiff asked Defendant if he lived outside of New York City. He responded that he had, years before, worked from a Morgan office in Westchester County and that this prior office address often came up because it was still associated with some of his Morgan credit card billing statements. Said statements were patently false because Defendant neither worked from a Westchester office nor had credit card billing statements reflective of such.

75.    Eventually, Defendant calmed Plaintiff's concerns by repeatedly lying to her about Robin Rodriguez. Plaintiff relied upon Defendant's lies to her detriment by continuing the relationship with him unaware of the scope of his scheme to defraud her.

76.    Defendant told Plaintiff that, after receiving and accepting an offer from Credit Suisse, he provided Tom Duala with a resignation letter on Friday, April 27, 2007, the same date he and Plaintiff were to travel to Houston.

77.    Defendant told Plaintiff that he met with Tom Duala and that the meeting did not go well. Defendant claimed he gave Tom Duala several weeks notice, but Duala had told him his last day would be April 30, 2007.

78.    Defendant said that Tom Duala became very emotional over Defendant leaving Morgan.  This was another lie.  Actually, Tom Duala directed Defendant to leave Morgan immediately and thereafter notified Morgan's security and human resources personnel to prepare for Defendant's April 30, 2007 departure.  Defendant willfully withheld such information from Plaintiff.

79.    On April 27, 2007, Defendant brought his luggage for Houston to the 32nd floor and asked Plaintiff to keep it at her desk.

80.    Plaintiff and Defendant shared a cab to JFK airport on April 27, 2007.

15

81.    During the cab ride, Plaintiff asked Defendant why he had not returned any of her calls to his Morgan Blackberry cell phone.

82.    Defendant stated he had not received any such calls. This was yet another lie.

83.    Defendant showed Plaintiff his Blackberry's "missed calls" screen in an effort to persuade Plaintiff he had not received her multiple calls. When Plaintiff looked at the screen she saw a record of her calls to him and also saw that Defendant had received multiple calls and/or emails from "Robin Rodriguez."

84.    Plaintiff confronted Defendant about Robin Rodriguez at which time Defendant began to cry.

85.    During the course of Defendant's emotional breakdown, he continued the lies, telling Plaintiff that Robin Rodriguez was his "ex-wife" from whom he had been divorced for three years.

86.    Defendant said he and his wife had no children and that Plaintiff was the woman with whom he could make a fresh start.  Defendant explained to Plaintiff that he was embarrassed over his failed marriage.

87.    He further stated he feared Plaintiff would have rejected him had she known he was divorced.  Defendant also said the reason he was divorced was because his ex wife, Robin

Rodriguez, could not have children and it meant a lot to him to have a family.  Defendant said that he and Robin were married for a total of eight years.

88.    Defendant told Plaintiff the job at Credit Suisse was a new beginning for him and persuaded Plaintiff to be part of that new life.

89.    Reluctantly, Plaintiff accompanied Defendant on the trip to Houston for his seminar, relying upon Defendant's further lies to her detriment.

90.    On Sunday, Plaintiff and Defendant arrived back at JFK from Houston at approximately 10:30 p.m..

91.    Defendant told Plaintiff, when they arrived in New York, he wanted to go to the office that night to pack up his belongings so as to avoid the embarrassment and humiliation of doing so on Monday, April 30, 2007 in front of multiple co-workers. This was in direct violation of directives Defendant received from Morgan on April 27, 2007.

92.    Defendant asked Plaintiff to go with him to Morgan to help him pack, and she agreed, wholly unaware that Defendant was not authorized to return to Morgan until business hours on April 30, 2007.

93.    When they arrived at Morgan, and went to the 33rd floor where he worked, Defendant claimed his access card would not work because he had it kept it in his wallet near his

Blackberry. This too was a lie. Either Morgan confiscated Defendant's access card on April 27, 2007, or deactivated it.

94.    Upon information and belief, after his resignation meeting and before his trip to Houston, Tom Duala directed Defendant to leave Morgan and not return to retrieve his belongings until and unless he was escorted by Morgan corporate security.

95.    Believing Defendant's lie about his access card, when Defendant asked for Plaintiff to swipe him onto the 33rd floor, she did so. Said act resulted in an electronic record being established in Morgan's security system that Plaintiff had entered the 33rd floor.

96.    Hours later, Plaintiff was exhausted, but Defendant was still packing. She told him she needed to work the next day and wanted to go home.

97.    Plaintiff went home, leaving Defendant at Morgan with her access card since he said he would leave it on her desk when he left. Plaintiff engaged in such conduct based upon her acceptance of Defendant's fraudulent representations regarding the true circumstances of his departure from Morgan and Defendant's acts and omissions which were beyond his authority at Morgan.

98.    On May 2, 2007, after Defendant left Morgan's employ, Plaintiff was summoned to a meeting upon her arrival at Morgan.

99.     Plaintiff was brought to a room where she was confronted by personnel from Morgan's security, human resources and legal offices.

100.    A Morgan lawyer demanded to know where Plaintiff had been the prior weekend. Plaintiff stated she had been with a friend.

101.    The Morgan lawyer told Plaintiff that Morgan knew all about her relationship with Defendant, knew she had been with him the prior weekend, and that Morgan was in the midst of a criminal investigation into Defendant's acts.  Plaintiff was threatened that if she did not cooperate, she too would be embroiled in the criminal investigation.

102.    The Morgan lawyer further questioned Plaintiff regarding her relationship with Defendant, asking such questions as how many times Defendant had slept at her house and whether they had engaged in sexual relations.

103.    Plaintiff was questioned about her actions with Defendant on the night they returned from Houston, and she explained what she had done and that she let Defendant use her access card because she trusted that what he was saying to be true.

104.    The Morgan lawyer told Plaintiff she was not permitted to talk to Defendant again, in response to which Plaintiff told the Morgan lawyer that Defendant was her boyfriend.

105.    On May 3, 2007, Plaintiff was told she was being terminated "for cause," that she would be blacklisted, and that she would not receive a positive reference from Morgan, notwithstanding her exemplary and blemish free work history.

## FIRST CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH CONTRACT

106.    Plaintiff, KRISTEN BURKE repeats and reiterates the allegations contained within paragraphs "1" through "105", inclusive, as if set forth more fully and at length herein, and with the same force and effect.

107.    Plaintiff, KRISTEN BURKE, had a valid at-will employment contract with Morgan.

108.    Defendant, DANIEL RODRIGUEZ, had knowledge of the contract between Plaintiff and her employer.

109.    Defendant, DANIEL RODRIGUEZ, intentionally, by way of fraud, misrepresentation, and deceit, improperly caused the breach of Plaintiff's employment contract with Morgan.

110.    The breach of said contract, which Defendant, DANIEL RODRIGUEZ, did cause, has resulted in financial and emotional damage to Plaintiff herein.

111.    That by reason of the foregoing, Plaintiff has been damaged as a result of Defendant's wrongful acts in the amount of $5,000,000.00 (FIVE MILLION DOLLARS).

## SECOND CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

112.    Plaintiff, KRISTEN BURKE repeats and reiterates the allegations contained within paragraphs "1" through "111", inclusive, as if set forth more fully and at length herein, and with the same force and effect.

113.    Defendant, DANIEL RODRIGUEZ, had a duty, as a result of his special relationship with Plaintiff, by virtue of his superior position to her at Morgan, to furnish Plaintiff with accurate and correct information.

114.    Notwithstanding said special relationship, Defendant did make numerous false statements to Plaintiff, all of which Defendant knew to be false.

115.    The information supplied in Defendant's representations was known by the Defendant to be desired by the Plaintiff for a serious purpose.

116.    The Plaintiff intended to rely upon Defendant's false statements and act upon them.

117.    Plaintiff did rely upon Defendant's false statements, all to her detriment, resulting in damage in the amount of $5,000,000.00 (FIVE MILLION DOLLARS).

## THIRD CAUSE OF ACTION

## FRAUD

117.    Plaintiff, KRISTEN BURKE repeats and reiterates the allegations contained within paragraphs "1" through "116", inclusive, as if set forth more fully and at length herein, and with the same force and effect.

118.    As set forth, supra, Defendant did make numerous representations to Plaintiff.

119.    Said representations were material to the matters at hand.

120.    Defendant knew at the time he uttered said statements that they were false.

121.    Defendant made such statements with the intent of misleading Plaintiff.

122.    Given the scope and nature of Defendant's scheme to deceive, Plaintiff justifiably relied upon his false statements.

123.    Plaintiff's justifiable reliance upon said false statements proximately caused

Plaintiff to suffer financial damage and emotional injury.

124.    That by reason of the foregoing tortuous conduct, Plaintiff has been damaged as a result  of Defendant's wrongful conduct in the amount of $5,000,000.00 (FIVE MILLION DOLLARS).

125.    That by reason of the foregoing willful and wanton tortious acts by Defendant,

and Defendant's malice and reckless disregard for the rights of Plaintiff, she is entitled to

punitive damages from Defendant in the amount of $5,000,000.00 (FIVE MILLION

DOLLARS).


WHEREFORE, Plaintiff KRISTEN BURKE, demands judgment against the

Defendant in the sum of:

(i)     $5,000,000.00 (FIVE MILLION DOLLARS) on the FIRST CAUSE OF
ACTION;

(ii)    $5,000,000.00 (FIVE MILLION DOLLARS) on the SECOND CAUSE OF
ACTION;

(iii)   $5,000,000.00 (FIVE MILLION DOLLARS) on the THIRD CAUSE OF
ACTION; and

(iv)    $5,000,000.00 (FIVE MILLION DOLLARS) in punitive damages.


Dated: New York, New York
August 15, 2007


ROBINSON & YABLON, P.C.
Attorneys for Plaintiff


By: Andrew M. Laskin (AL9379)
232 Madison Avenue, Suite 1200
New York, New York 10016
(212) 725-8566


23

## VERIFICATION

**KRISTEN BURKE**, being duly sworn, deposes and stated the following under penalty of perjury:

I am the plaintiff in the within action before this Court. I do personally swear that the contents of my Second Amended Verified Complaint are true.

Dated: New York, New York
      August 15, 2007

_____
KRISTEN BURKE

ANDREW MICHAEL LASKIN
NOTARY PUBLIC, State of New York
No.02LA6155745
Qualified in New York County
Commission Expires Nov. 20, 2010

_____
Notary Public